# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

**Laurie A. Martin,**

      **Plaintiff,**

v.

**Michael J. Astrue,**
**Commissioner of Social Security,**

      **Defendant.**

Civil No. 09-1998 (RHK/JJG)

**REPORT AND RECOMMENDATION**

---

JEANNE J. GRAHAM, United States Magistrate Judge

Plaintiff Laurie A. Martin seeks judicial review of the denial of her application for disability insurance benefits. The case was referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b) and is presently before the Court on cross-motions for summary judgment.

Plaintiff asserts three points of error by the Defendant Commissioner of Social Security: that the administrative law judge (ALJ) failed to account for limitations in the use of her hands due to scleroderma, that the ALJ failed to consider her subjective allegation of fatigue, and that the ALJ disregarded her boyfriend's testimony at the administrative hearing. Defendant asks the Court to uphold the denial of benefits. For the reasons stated below, the Court recommends that Plaintiff's motion be denied and Defendant's motion be granted.

## I. BACKGROUND

Plaintiff filed for disability insurance benefits on December 12, 2005, alleging she became disabled on May 12, 2005. (R. at 10.) She was forty-seven years old on the alleged onset of disability date. (R. at 22.) Plaintiff's claimed disabilities included multiple sclerosis,

scleroderma, fibromyalgia, osteoarthritis, depression, pain, Raynaud's phenomenon, and fatigue. (R. at 136.)

## A. Relevant Medical Evidence

The Court begins its review of medical evidence with records dated near Plaintiff's alleged onset of disability date. On April 1, 2005, Plaintiff complained of low back pain during an appointment with her rheumatologist, Dr. Scott Glickstein. (R. at 279.) Plaintiff appeared alert, oriented, and not in distress. (*Id.*) She did not report any fatigue or problems using her hands. (*Id.*) Dr. Glickstein described her sclerodactyly as "mild." (*Id.*)

Plaintiff saw her primary physician, Dr. John Bartlett, on May 20, 2005 for mid-back pain. (R. at 272.) She did not mention feeling fatigued and did not complain of hand pain or difficulty using her hands. (*Id.*)

On June 14, 2005, Plaintiff saw musculoskeletal specialist Dr. Daniel Kurtti on a referral from Dr. Bartlett. (R. at 283.) Her chief complaint was low back pain, but she also reported fatigue, weight gain, skin rashes, dizziness, headaches, sore throat, shortness of breath, chronic cough, diarrhea, stomach pain, nausea, vomiting, joint pain, and depression. (R. at 284.) Dr. Kurtti noted no swelling in Plaintiff's lower extremities, no problems with stability, and normal strength, although her gait appeared slow and somewhat painful. (*Id.*) He described Plaintiff's mood as normal and her affect appropriate. (R. at 285.) Dr. Kurtti remarked that Plaintiff intended to look for a different job because prolonged standing was difficult. (*Id.*)

Plaintiff returned to Dr. Bartlett on September 16, 2005, but did not report any fatigue or difficulty using her hands. (R. at 265.) Dr. Bartlett wrote that Plaintiff's depression was controlled and she was tolerating her medication well. (*Id.*) A few weeks later, Dr. Glickstein

noted that Plaintiff's CREST syndrome[1] and scleroderma were stable, and she had no progressive skin thickening. (R. at 266.) Although Dr. Glickstein described Plaintiff's Raynaud's phenomenon as "active," he noted no functional limitations as a result. (*Id.*) Plaintiff's chief complaint was back pain. (*Id.*)

Plaintiff saw psychiatrist Dr. Susan Swigart on October 28, 2005, for a psychiatric evaluation. (R. at 252.) Plaintiff described herself as having low energy, but she did not say she was fatigued. (R. at 252-54.) In a medical report dated March 8, 2006, psychologist Janet Putnam wrote that on a typical day Plaintiff slept late, was slow to get started, did some light housekeeping, watched television, and ran errands if she felt well. (R. at 312.)

Plaintiff underwent a mental status exam by Minnesota Social Security Disability Determination Services examiner Dan Sorenson on April 14, 2006. (R. at 354.) Plaintiff said she had quit working as a cook because she was in pain and could not stand longer than fifteen minutes. (*Id.*) Her chief complaints were back pain, nausea, and not feeling well in general. (*Id.*) Plaintiff told Sorensen she suffered from fatigue, despite sleeping ten to twelve hours a night and napping daily. (*Id.*) Her pain and fatigue caused her to perform chores slowly. (*Id.*) Sorensen diagnosed her with recurrent major depression, mild or moderate in degree, in partial remission. (R. at 356.) He found that Plaintiff could understand and follow instructions, maintain persistence and pace, and perform work involving brief, superficial interactions with others. (*Id.*)

Dr. Charles T. Grant completed a Physical Residual Functional Capacity Assessment of Plaintiff on April 12, 2006. (R. at 360-367.) He noted a primary diagnosis of back pain with a secondary diagnosis of scleroderma. (R. at 360.) Dr. Grant remarked that Plaintiff had some

---

[1] CREST is an acronym for calcinosis, Raynaud's phenomenon, esophageal dysfunction, sclerodactyly, and telangectasias. (R. at 232.)

thickening of the skin on her hands, but that no functional impairments were recorded in her medical records. (R. at 361.)

In a letter dated July 17, 2006, Putnam wrote that Plaintiff suffered from a dysthymic disorder with periodic episodes of a more major depressive disorder. (R. at 392.) Putnam indicated that Plaintiff had difficulty maintaining her household, but she did not mention fatigue. (*Id.*) Putnam also remarked that Plaintiff had no cognitive problems with understanding, remembering, or concentrating. (*Id.*)

Plaintiff saw Dr. Daniel Freking on September 18, 2006 for fatigue. (R. at 427.) Plaintiff reported feeling tired during the day, having trouble falling asleep at night, waking about ten times a night, and not feeling rested after awakening. (*Id.*) Dr. Freking remarked that Plaintiff's mental state appeared normal; she had no deficit of speech, comprehension, intellect or mood; and her gait and coordination were normal. (R. at 428.) Dr. Freking was uncertain whether Plaintiff's fatigue was caused by chronic disease, a sleep disorder, periodic limb movements, or a respiratory disturbance. (*Id.*) At Dr. Freking's recommendation, Plaintiff agreed to participate in a sleep study. (*Id.*)

Plaintiff saw Dr. Twila Germanson on August 22, 2006 for a psychiatric consultation. (R. at 469.) Plaintiff said she was not sleeping well because her cat had died recently. (R. at 471.) She reported low energy and jerking awake after falling asleep. (*Id.*) Dr. Germanson recommended waiting for the sleep study results before forming a treatment plan. (R. at 472.)

On September 29, 2006, Plaintiff reported persistent fatigue to Dr. Bartlett, who noted Plaintiff would be participating in a sleep study. (R. at 418.) Dr. Bartlett encouraged Plaintiff to speak with her psychiatrist about fatigue and changing her medication for depression. (R. at 419.)

On October 5, 2006, Dr. Glickstein noted that Plaintiff was suffering from increased dizziness, fatigue, and nausea. (R. at 420.) He described her Reynaud's syndrome as stable and her sclerodactyly as mild. (*Id.*)

Plaintiff returned to Dr. Freking on October 25, 2006. (R. at 416.) She had been diagnosed with sleep apnea, and she was using a CPAP machine four or five hours a night. (*Id.*) She reported feeling better, and Dr. Freking encouraged her to continue using the CPAP machine. (*Id.*)

During an appointment with Dr. Bartlett on November 15, 2006, Plaintiff reported she was getting used to the CPAP machine and was sleeping uninterrupted for about six hours a night. (R. at 450.) She felt her fatigue had improved, and she was no longer as tired in the afternoon. (*Id.*) Dr. Bartlett encouraged her to continue working with her psychiatrist on reducing her fatigue. (R. at 451.)

Plaintiff returned to Dr. Germanson on November 20, 2006, and reported she was feeling better. (R. at 473.) She felt more rested since using the CPAP machine, and her mood and energy had improved. (*Id.*) Plaintiff's memory, affect, speech, insight, and judgment were all normal and good. (*Id.*)

In December 2006, Plaintiff told Putnam she had been denied disability benefits twice and was feeling more depressed than ever. (R. at 467.) She was sleeping twelve hours a day, plus occasional naps. (*Id.*) Putnam recommended that Plaintiff consider vocational rehabilitation to reenter the workforce. (*Id.*)

On February 20, 2007, Plaintiff told Dr. Germanson, "Things are going very well." (R. at 475.) Plaintiff was using the CPAP machine but felt it caused severe sinus headaches in the mornings. (*Id.*) Plaintiff told Dr. Germanson she had required ten to twelve hours of sleep a night

for the past ten years. (*Id.*) Plaintiff also discussed the effect of cold weather on her Raynaud's syndrome. (*Id.*)

During a follow-up appointment with Dr. Germanson on May 21, 2007, Plaintiff said her symptoms of depression had improved, but she felt tired all the time. (R. at 477.) She was sleeping twelve to fourteen hours a day. (*Id.*) She was still using the CPAP machine two to three times a week, despite suffering headaches. (*Id.*) Dr. Germanson recommended that Plaintiff return to the sleep clinic for an adjustment to the CPAP machine. (R. at 480.)

Plaintiff reported to Dr. Germanson in September 2007 that her mood and energy had improved, and she had begun cross-stitching at night. (R. at 481.) However, her sleep had recently become more erratic. (*Id.*) Two months later, Plaintiff told Dr. Germanson that everything was stable and that her mood, energy, and pain had improved. (R. at 483.) She continued to cross-stitch and hoped to start another craft. (*Id.*) She was also baking cookies for her boyfriend. (*Id.*) Plaintiff's sleep was no longer erratic, as she had begun taking her thyroid medication in the morning, as directed, rather than at night. (*Id.*) Plaintiff also discovered that she slept better at night if she did not nap during the day. (*Id.*) She was still sleeping twelve hours a night. (*Id.*)

In April 2007, Putnam wrote that Plaintiff had been feeling increased tension and pain in her shoulders. (R. at 505.) Plaintiff said she had been cleaning more often and felt energized by it. (*Id.*) On May 15, 2007, however, Plaintiff said she was not feeling well and was having trouble sleeping. (*Id.*) In subsequent visits, Putnam and Plaintiff primarily discussed problems Plaintiff was having with her boyfriend. (R. at 506-08.) In August 2007, Plaintiff said she was fatigued from a trip to the state fair and camping with her boyfriend. (R. at 508.) A month later,

Plaintiff told Putnam she was "mentally okay" and had attended several birthday celebrations. (R. at 509.) She was preparing to move in with her boyfriend, and her affect was positive. (*Id.*)

Putnam completed a Mental Impairment Questionnaire on November 1, 2007. (R. at 459-463.) She noted that Plaintiff had a poor memory, sleep disturbance, mood disturbance, and decreased energy, among other symptoms. (R. at 459.) She wrote that Plaintiff would have difficulty with any kind of perceived pressure or time limits, could not multitask, and would have problems with interpersonal conflicts and criticism. (R. at 460.)

In January 2008, Dr. Glickstein described the sclerodactyly on Plaintiff's fingers as mild. (R. at 497.) That same month, he completed a Fibromyalgia Questionnaire, listing Plaintiff's symptoms as tender points, nonrestorative sleep, chronic fatigue, Raynaud's phenomenon, depression, and hypothyroidism. (R. at 554-57.) He thought Plaintiff's symptoms would occasionally or frequently interfere with her ability to perform simple work tasks, and that Plaintiff would miss four work days a month. (R. at 555, 557.) Although he thought Plaintiff could tolerate stress when she felt well, the variable nature of the symptoms would make full-time work difficult. (R. at 555.) On the part of the form detailing functional limitations, Dr. Glickstein indicated numerous times that he did not know the degree to which Plaintiff's impairments would restrict her abilities. (R. at 555-56.) Other times, he qualified his answers with "per patient's responses." (R. at 557.) With respect to Plaintiff's prognosis, he wrote that she had a "likelihood of meaningful improvement." (R. at 554.)

In Putnam's treatment note of April 30, 2008, she remarked that Plaintiff's lawyer wanted her to lower Plaintiff's Global Assessment of Functioning score. (R. at 513.) Plaintiff brought a new form for Putnam to complete, and Putnam called Plaintiff's attorney, Ethel Schaen, who suggested some changes that Putnam felt comfortable making. (*Id.*)

7

During a visit with Dr. Germanson in June 2008, Plaintiff reported pain in her neck and shoulders, but described her mood as good. (R. at 485.) She was continuing to cross-stitch at night and had just gotten a puppy. (*Id.*) Plaintiff had not returned to the sleep clinic to resolve the headaches caused by the CPAP machine. (*Id.*)

Dr. Glickstein treated Plaintiff on July 17, 2008 for her CREST syndrome, pain, sleep apnea, depression, and other medical conditions. (R. at 495.) Her chief complaints were neck and shoulder pain and depression. (*Id.*) Dr. Glickstein noticed telangiectasias on her face and hands, as before, and "[s]light sclerodactyly," which was unchanged. (*Id.*) All joints, limbs, and muscles were normal in strength, range of motion, and stability. (*Id.*)

Plaintiff revisited Dr. Glickstein on August 7, 2008. (R. at 491.) He noted pain in her neck, back, legs, and head, but not in her hands. (*Id.*) He assessed her as having fibromyalgia and noted functional limitations in sleeping, walking on stairs, driving, and household chores. (*Id.*) Dr. Glickstein recommended pool therapy and thought Plaintiff's prognosis was good. (R. at 492.)

### B. Other Subjective Evidence from Plaintiff

In a Disability Report, Plaintiff wrote that carpel tunnel syndrome limited her ability to work on computers and perform repetitive hand movements; low back pain limited her ability to stand and walk or sit for long periods of time; and extreme fatigue required her to sleep more than twelve hours a night. (R. at 136.) She said she had stopped working because of severe low back pain. (R. at 137.)

Plaintiff wrote in a Function Report that on a typical day she wakes late, has lunch, takes a nap, cleans the house with frequent breaks, watches television or reads, talks on the telephone, and prepares dinner. (R. at 151.) She is able to do light dusting, light laundry, wash dishes, and

clean the bathroom. (R. at 153.) Stiffness, joint pain, inflammation, tissue tightening, and headaches preclude her from doing additional house or yard work. (R. at 154.) Plaintiff drives a car, shops, goes out to eat, and visits friends and family. (R. at 154-55.)

### C. Administrative Proceedings

After Plaintiff's application for disability benefits was denied initially and on reconsideration, she requested an administrative hearing before an ALJ. At that hearing, Plaintiff testified she suffers from back problems, fibromyalgia, scleroderma, and pain. (R. at 30.) She quit her most recent job because of severe back pain. (R. at. 29.) One of her medications, Gabapentin, causes sleepiness, and she sleeps twelve hours a night. (R. at 30.) Plaintiff's boyfriend helps her take care of her house, but she sees him only occasionally during the week. (R. at 31.) Plaintiff testified she has difficulty using her hands because of carpal tunnel syndrome, scleroderma, and finger ulcers resembling pits in her fingertips. (R. at 32.) Plaintiff described her hands as clumsy, swollen, and painful. (R. at 35.)

Plaintiff's boyfriend, Mark Winterer, testified that on good days, Plaintiff sits on the couch, watches television, and cooks a meal. (R. at 38.) On bad days, she stays in bed. (*Id.*) According to Winterer, Plaintiff has six good days a month. (*Id.*)

In a written decision dated February 19, 2009, the ALJ determined that Plaintiff was not disabled from May 12, 2005 through February 19, 2009. (R. at 10.) The ALJ found that Plaintiff had severe impairments of scleroderma with CREST syndrome, degenerative disc disease with low back pain and myofascial pain, obesity, sleep apnea, vestibular dysfunction, gastroesophageal reflux disease, and a major depressive or dysthymic disorder. (R. at 12.) However, these combined impairments did not meet or medically equal a listed impairment. (R. at 13.) The ALJ determined that Plaintiff had the residual functional capacity (RFC) to perform

light, unskilled or semi-skilled work (R. at 14), but that she could not perform any of her past relevant work (R. at 22). Considering Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff could work in jobs existing in significant numbers in the national economy. (R. at 23.)

Plaintiff sought review from the Appeals Council, which denied her request. (R. at 1). The ALJ's decision is therefore the final decision of the Commissioner.

## II. STANDARD OF REVIEW

On review of an ALJ's decision denying social security benefits, a court examines whether the findings of the ALJ are "supported by substantial evidence in the record as a whole." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (citation omitted). When assessing whether this standard is met, a court must consider evidence that supports, as well as evidence that contradicts, the factual findings of the ALJ. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005). The ALJ's decision should not be reversed just because some evidence supports another outcome. *Id.* If it is possible to reach conflicting positions from the record, but one of those positions is that of the ALJ, the decision must be affirmed. *Id.*

## III. DISCUSSION

Plaintiff contends that the ALJ erred in three respects. First, she faults the ALJ for failing to account for limitations in using her hands due to scleroderma. Second, she contends that the ALJ failed to consider her subjective allegation of fatigue. Third, and relatedly, she argues that the ALJ ignored her boyfriend's testimony that she has only six good days a month.

### A. Limitations on the Use of Plaintiff's Hands Due to Scleroderma

The mere presence of a medical condition is not per se disabling. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990). The claimant must also show that the condition causes

functional limitations. *See id.* Here, the medical record is devoid of any functional limitations caused by Plaintiff's sclerodactyly. Her doctors' treatment notes reflect no limitations on manual dexterity, strength, or any other function. Her doctors do not describe her hands as clumsy, swollen, or painful, as she did at the hearing. In fact, Dr. Glickstein repeatedly described Plaintiff's sclerodactyly as "mild" and "slight" and noted no functional limitations.

The only medical evidence supporting Plaintiff's claimed limitations is the Fibromyalgia Questionnaire Dr. Glickstein completed in January 2008. Dr. Glickstein indicated that Plaintiff's symptoms, in general, would interfere with her ability to work. When asked to describe the degree of functional impairment, Dr. Glickstein either said he did not know or qualified his answers with "per patient's responses." An ALJ may discredit a physician's opinion that is based solely on subjective complaints. *Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1999). To the extent the questionnaire could be interpreted as imposing a functional limitation due to sclerodactyly, the ALJ properly rejected it as inconsistent with Dr. Glickstein's own treatment notes and the objective medical record. *See Choate v. Barnhart*, 457 F.3d 865, 870 (8th Cir. 2006).

Other record evidence also supports the conclusion that Plaintiff was not functionally limited in using her hands. Plaintiff testified she had stopped working in 2005 because of low back pain, not because sclerodactyly was affecting her hands. Plaintiff also routinely performed daily activities requiring the use of her hands, such as preparing meals, baking, light housekeeping, using a computer, and cross-stitching.

In sum, the ALJ's omission of any limitations caused by Plaintiff's scleroderma is supported by substantial evidence in the record as a whole.

B.     **Plaintiff's Subjective Complaint of Fatigue**

In assessing a claimant's credibility concerning subjective complaints, an ALJ must consider not only the objective medical evidence but also the claimant's prior work history, observations by third parties and physicians, daily activities, the extent and intensity of the subjective complaint, the effects and effectiveness of medications, functional restrictions, and any other aggravating factors. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ may discredit a claimant based on "inconsistencies in the evidence as a whole." *Id.*

The ALJ considered Plaintiff's subjective complaints of pain and fatigue together. (R. at 15.) It is acceptable for an ALJ to combine several subjective complaints into one discussion. *See Aborn v. Sullivan*, 959 F.2d 111, 112 (8th Cir. 1992). The ALJ did not discredit Plaintiff's complaints entirely, but concluded that the claimed severity and limiting effects of her pain and fatigue were not credible. (R. at 15.)

In reaching this conclusion, the ALJ first observed that the objective medical evidence was inconsistent with a disabling degree of fatigue. (*Id.*) The ALJ did not err in this respect. Although the medical record contains numerous self-reports of fatigue and excessive sleep, Plaintiff's physicians did not describe her as appearing or acting tired. Dr. Freking, who treated Plaintiff specifically for fatigue, remarked that her mental state was normal; she had no speech, comprehension, intellectual, or mood deficits; and her gait and coordination were normal. After Plaintiff was diagnosed with sleep apnea, she was prescribed a CPAP machine. This conservative course of treatment is not consistent with the claimed severity of Plaintiff's fatigue. After Plaintiff began using the CPAP machine, she told her doctors she felt better and was sleeping uninterrupted for up to six hours a night and for a total of ten to fourteen hours. She was no longer as tired in the afternoons, and her mood and energy had improved. When Plaintiff

began suffering headaches from the CPAP machine, she did not revisit the sleep clinic for an adjustment, despite her doctor's admonition. Plaintiff's failure to follow through on this suggestion, which could have further improved her success with the CPAP machine, counterbalances the claimed severity of her fatigue. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (failure to follow through with treatment weighs against credibility).

None of Plaintiff's doctors imposed any functional restrictions specifically to accommodate her fatigue. For example, no doctor instructed Plaintiff to take naps or lie down during working hours. *See Pemberton v. R.R. Ret. Bd.*, 108 F.3d 189, 195 (8th Cir. 1997). The ALJ considered the functional limitations suggested by Dr. Glickstein and Putnam but rejected those limitations for legitimate reasons. In rejecting Putnam's suggested limitations, the ALJ noted that her opinion was conclusory, based primarily on Plaintiff's self-reports, and altered at Plaintiff's counsel's request. (R. at 19.) In rejecting Dr. Glickstein's suggested limitations, the ALJ noted that the opinion was conclusory, at odds with Dr. Glickstein's own treatment notes and the objective medical evidence, and admitted a lack of knowledge about Plaintiffs' condition. (*Id.*) The ALJ observed that none of Plaintiff's doctors or providers indicated that she was disabled or unable to work due to fatigue or any other condition. (*Id.*)

Plaintiff's prior work history does not support her subjective complaint of disabling fatigue. In February 2007, Plaintiff told Dr. Germanson that she had been sleeping for ten to twelve hours a night for the past ten years. Notably, Plaintiff worked during approximately eight of those years. Her ability to work while suffering from fatigue for so many years is inconsistent with the claimed severity of her fatigue. In addition, when Plaintiff finally stopped working in May 2005, the reason was back pain, not fatigue.

Plaintiff's daily activities also do not support her allegation of disabling fatigue. Although she sleeps ten to fourteen hours a night and occasionally naps during the day, on good days, she is able to prepare meals, bake, do light housekeeping, shop, use a computer, travel, camp, cross-stitch, care for a puppy, run errands, go to birthday parties and the state fair, drive a car, eat at restaurants, and visit friends and family. These daily activities are not consistent with her claim of disabling fatigue. *See Nguyen v. Chater*, 75 F.3d 429, 431 (8th Cir. 1996). Further, the recent improvement in her level of fatigue has presumably resulted in her having more good days.

With respect to the effects and effectiveness of Plaintiff's medication, there is testimony from Plaintiff that Gabapentin makes her sleepy. On the other hand, Plaintiff's sleep became less erratic in December 2007, when she began taking her thyroid medication as directed. The benefits and disadvantages of Plaintiff's medication do not greatly affect her credibility one way or the other.

The Court concludes that the ALJ conducted a proper *Polaski* analysis of Plaintiff's subjective complaint of fatigue.

### C. Winterer's Testimony

Plaintiff denounces the ALJ for not crediting her boyfriend's testimony that she has only six good days a month. Observations by third parties are just one of the *Polaski* factors. *See Polaski*, 739 F.2d at 1322. An ALJ need not discuss all evidence of record, and a failure to do so does not mean the evidence was not considered. *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000). Here, the ALJ mentioned Winterer's testimony that he often helped Plaintiff with most activities of daily living and that Plaintiff has some good days. (R. at 15.) The ALJ's failure to specifically address Winterer's testimony that Plaintiff has only six good days a month did not

render his otherwise thorough *Polaski* analysis insufficient. Moreover, the ALJ was entitled to discredit Winterer's testimony because he saw Plaintiff generally only on weekends, and because no other source—not even Plaintiff—indicated that she was able to get out of bed only six days a month.

**IV. RECOMMENDATION**

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 16) be **DENIED**; and

2. Defendant's Motion for Summary Judgment (Doc. No. 19) be **GRANTED**.


Dated: June 7, 2010                                           s/ *Jeanne J. Graham*
                                                                                 JEANNE J. GRAHAM
                                                                                 United States Magistrate Judge


**NOTICE**

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **June 22, 2010**. A party may respond to the objections within ten days after service thereof. Any objections or responses shall not exceed 3,500 words. The district judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made.